IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DONALD G. STUDDERS, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| | Case No. 2:12-cv-00329-RJS |
| v. | |
| CAROLYN W. COLVIN, | Judge Robert J. Shelby |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Donald G. Studders seeks judicial review of the decision of the Acting Commissioner of Social Security denying Mr. Studders' application for Disability Insurance Benefits and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act), 42 U.S.C. Sections 405(g) and 1383(c). The court heard argument on June 13, 2013. John Borsos appeared for Mr. Studders, and Kirsten Westerland appeared on behalf of the Commissioner. After a careful review of the record and for the reasons discussed below, the court finds the Commissioner's decision is supported by substantial evidence and is therefore AFFIRMED.

## BACKGROUND

### I. Procedural History

In July 2009, Mr. Studders filed his Social Security application, alleging a disability onset date of December 31, 2006. (R. at 198-212). His application was denied, and Mr. Studders requested a hearing before an Administrative Law Judge. (R. at 94-98, 104-09, 112-19). After the hearing, Judge Donald R. Jensen issued an unfavorable decision, finding Mr. Studders not disabled within the meaning of the Act. (R. at 14-33). Mr. Studders then requested review by

1

the Appeals Council. The Appeals Council denied his request for review (R. at 1-6), making Judge Jensen's decision final for purposes of judicial review. 20 C.F.R. § 404.981.

## II. Factual Background

In his applications for benefits, Mr. Studders claimed his diabetic neuropathy, peripheral artery disease, and depression limited his ability to work. Later, he also alleged limitations due to chronic obstructive pulmonary disease (COPD) and back pain. (R. at 81-82, 253).

### A. Medical Record

The medical record from Mr. Studders' December 31, 2006 alleged onset of disability through 2010 demonstrates that Mr. Studders had a number of visits to the emergency room due to illnesses related to his diabetes. He infrequently sought regular non-emergency care and physicians opined that his diabetic episodes were due to poor control. The record documents the following relevant to his disability application:

- In July and September 2008, Mr. Studders went to the Emergency Room twice related to his blood sugar being too low, but quickly improved with treatment. (R. at 354-55, 370-72).

- In April and May 2009, Mr. Studders returned to the Emergency Room, unable to control his blood sugar. (R. at 389, 413). In both instances, he was diagnosed with diabetic ketoacidosis secondary to esophagitis. (R. 389, 413). In the latter visit, Dr. James Rasmussen stated that he believed that the diabetic ketoacidosis was most likely caused by his esophagitis, which Mr. Studders was supposed to control with an acid reflux medicine (PPI), but which he had failed to take. (R. at 412-13). Additionally, Dr. Rasmussen "suspect[ed] poor control" by Mr. Studders of his diabetes. (R. at 413).

- In June 2009, Mr. Studders followed up with a physician's assistant. The physician's assistant noted some compliance with treatment, but also observed that Mr. Studders had "poor nutrition, rarely monitor[ing] carbohydrate and fat intake and [was] lead[ing] a sedentary life," also failing to follow up on recommended annual dilated eye exams, regular dental exams, and podiatrist appointments. (R. at 299). The physician's assistant had a "long discussion about benefits of keeping blood glucoses tightly controlled and risks of uncontrolled diabetes." (R. at 301).

- Also in June 2009, Mr. Studders returned to the Emergency Room. (R. at 427). He admitted to not checking his sugars or taking his acid reflux medicine (PPI). Dr.

Rasmussen noted that "[p]atient is non-compliant with care of his diabetes [and] with his severe erosive esophagitis." (R. at 431). He explained that Mr. Studders had "poor medical compliance" and that not taking his acid reflux medicine is "probably what got him in trouble again," noting only "possible mild diabetic ketoacidosis." (R. at 429).

- In August 2009, Mr. Studders sought care from Dr. Morris, who had treated him once in May 2006 for pneumonia. (R. at 469). Two weeks later, Dr. Morris filled out a disability report opining Mr. Studders could only work fifteen hours per week. (R. at 501-09).

- In October 2009, Dr. Rox Burkett, a state agency physician, reviewed Mr. Studders' medical records. He noted that while Mr. Studders had "several short inpatient hospital stays" in the last two years, the medical record did not establish a prolonged period where he could not do light work. (R. at 449). He opined that Mr. Studders could occasionally lift twenty pounds, frequently lift ten pounds, stand six hours in an eight-hour workday, sit six hours in an eight-hour workday, had no limitations in pushing/pulling, and had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 451-57). This opinion was confirmed by Dr. Lewis Barton. (R. at 496).

- Mr. Studders had a brief visit to the Emergency Room again in October 2009, but he responded well to treatment. (R. at 481).

- Also in October 2009, Mr. Studders saw Dr. Morris, who reported that his hypertension and acid reflux were stable, but that "patient [was] still not taking his medications, [and] needs to stay on diet." (R. at 462). At follow-up appointments in January 2010, March 2010, and June 2010, Mr. Studders reported feeling well, and Dr. Morris reported that his hypertension, acid reflux, and diabetes were all stable, with no change in the mild neuropathy. (R. at 516, 527, 529). At each appointment, Dr. Morris advised Mr. Studders to quit smoking cigarettes. (R. at 527).

- In June 2010, Dr. Morris filled out a second check-box form. (R. at 534-38). Dr. Morris reported that Mr. Studders had diabetes and neuropathy, reactive airway disease, and chronic pain syndrome, noting that he suffered from wheezing, chronic cough, asthma, sensory or reflex loss, skin breakdown, sleep disturbances, and decreased energy. (R. at 535-36). He checked boxes indicating that Mr. Studders had (a) an inability to ambulate effectively; (b) acidosis occurring at least on average of once every two months documented by appropriate blood chemical tests; and (c) neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. (R. at 537). From this, Dr. Morris opined that Mr. Studders could work even less, suggesting that he was capable of working only two hours a day, with significant limitations. (R. at 538).

**B. Testimonial Evidence**

The court has carefully read the transcript of the hearing before Judge Jensen on October 13, 2010, and finds that Judge Jensen accurately summarized Mr. Studders' testimony in his decision. (R. at 22-23). The court repeats a number of the salient points from the hearing transcript below.

Mr. Studders testified that his biggest problems were his diabetes, acid reflux, and pain in his toes and feet. (R. at 74). While Mr. Studders believed he had vision problems associated with his diabetes, he admitted that no problems were found at a recent checkup. (R. at 78). Similarly, he admitted to not being seen or treated for his COPD, back problems, or alleged depression. (R. at 81-82). Regarding questions by Judge Jensen as to his noncompliance with his diabetic care, Mr. Studders initially responded that any such reference must be contained in "records two or three years ago" (R. at 62), but later stated that he had always been compliant even several years prior, never missing his insulin or a treatment. (R. at 80). Mr. Studders did report significant improvement more recently, listing his daily blood sugar levels in October, all of which were within or close to the normal range, and answering affirmatively that he believed that treatment had been successful, though some residual problems remained. (R. at 76-77). Mr. Studders' counsel noted for the record that no nerve conduction studies indicative of neuropathy had been performed. (R. at 43).

Judge Jensen also heard testimony from a vocational expert, who was asked about the work possibilities for a hypothetical individual of Mr. Studders' age, education, and past work experience who could perform light work (occasionally lifting twenty pounds, frequently lifting ten pounds, standing six hours in an eight-hour workday, sitting six hours in an eight-hour workday, with no limitation in pushing/pulling, and no postural, manipulative, visual,

communicative, or environmental limitation). (R. at 88). The vocational expert testified that an individual with those limitations could perform jobs that exist in the national economy, such as mail clerk, parking lot attendant, and storage rental clerk. (R. at 88-89). The vocational expert further testified that these positions would permit a worker to lie down 1.5 hours in a day during scheduled breaks, be absent two times a month, and work at a 15-20 percent decreased range of attention and concentration. (R. at 89). When Mr. Studders' attorney asked whether these positions would permit a worker to leave the work station to test his blood sugars in privacy, the vocational expert responded that she thought two of the three positions would accommodate leaving the work station if he wanted privacy, and all three positions were "probably pretty good jobs for such a need." (R. at 90-91).

## ANALYSIS

### I. Standard of Review

The court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Substantial evidence "requires more than a scintilla but less than a preponderance." *Id.* It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). Further, the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's . . . . [and] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (citation omitted).

## II. Judge Jensen's Decision

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A person seeking Social Security benefits bears the burden of proving that he is disabled. *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009). However, once the claimant establishes that she cannot perform her past work, the burden of production shifts to the Commissioner to produce evidence of jobs that the claimant can perform despite his impairments. 20 C.F.R. § 404.1560(c)(2) (at step five, the agency must provide evidence that demonstrates that other work exists in significant numbers in the national economy that claimant can perform); *Heckler v. Campbell*, 461 U.S. 458, 461, 465, 470 (1983) (stating that the Secretary has the burden of producing evidence of jobs that a claimant can perform at step five, either through reliance on the grids or vocational expert testimony). The Commissioner has established a five-step process for determining whether a person is disabled:

(1) A person who is working is not disabled. 20 C.F.R. § 416.920(b).

(2) A person who does not have an impairment or combination of impairments severe enough to limit his ability to do basic work activities is not disabled. 20 C.F.R. § 416.920(c).

(3) A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. § 404, subpt. P, app. 1, is per se disabled. 20 C.F.R. § 416.920(d).

(4) A person who is able to perform work he has done in the past is not disabled. 20 C.F.R. § 416.920(e).

(5) A person whose impairment precludes performance of past work is disabled unless the Commissioner demonstrates that the person can perform other work available in the national economy. 20 C.F.R. § 416.920(f).

Judge Jensen performed this sequential analysis and found as follows: (1) Mr. Studders had not engaged in any substantial gainful activity since the date of his application; (2) he had severe impairments of diabetes mellitus with neuropathy, spondylosis with grade 1 spondylolisthesis, and chronic obstructive pulmonary disease; (3) he did not have an impairment or combination of impairments that meets or equals the listings; (4) he was unable to perform past relevant work; but (5) he was capable of performing work that exists in significant numbers in the national economy. (R. at 19-29).

### III. Mr. Studders' Objections to Judge Jensen's Ruling

Mr. Studders believes that Judge Jensen did not base his opinion on substantial evidence for three reasons. He argues that Judge Jensen erred in (a) rejecting the opinions of Dr. Morris; (b) not finding his own subjective testimony fully credible; and (c) not including more limitations in Mr. Studders' ultimate residual functional capacity. However, as addressed below, Judge Jensen's findings and decision are supported by substantial evidence and free of reversible legal error.

#### A. <u>Opinions of Dr. Morris</u>

Mr. Studders first contends that Judge Jensen erred when he found the opinions of Dr. Morris unpersuasive. A treating source's opinion cannot be given controlling weight if it is not well-supported by medically acceptable clinical or laboratory diagnostic techniques, or if it is

7

inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). However, an ALJ still must give "good reasons" in his decision for whatever weight he provides to a treating source opinion, be it great weight, little weight, or something in between. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 375188, at *5. While 20 C.F.R § 404.1527(c) provides a framework for how an ALJ is to weigh a medical opinion, an ALJ is not required to "apply expressly" every relevant factor for weighing opinion evidence. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Judge Jensen provided six reasons why he did not give Dr. Morris's opinions controlling weight and, additionally, found them unpersuasive. (R. at 26-27). First, he noted that "Dr. Morris's medical records do not reveal comprehensive assessments or examinations related to the claimant's alleged disabling impairments." (R. at 26). The record establishes Dr. Morris had seen Mr. Studders only twice before he rendered his August 2009 opinion. (R. at 329, 469). And, even though by the time of Dr. Morris's second opinion in June 2010, he had seen Mr. Studders four more times, during those visits, Dr. Morris's examinations were not extensive and he typically reported Mr. Studders' condition to be stable. (R. at 462, 516, 527, 529). Therefore, Judge Jensen reasonably discounted Dr. Morris's opinions for not being based on a comprehensive medical record. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) ("[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record") (quotation and citation omitted); *White v. Barnhart*, 287 F.3d 903, 907-08 (10th

Cir. 2002) (a treating physician's opinion may be rejected if there is a discrepancy between a very restrictive functional assessment and contemporaneous examination findings).

Mr. Studders argues that Dr. Morris's opinions were based on "comprehensive assessments and examinations," arguing that Dr. Morris must have "had access" to review Mr. Studders' hospital records and that "[t]here were no further exams that needed to be conducted." (Pl. Brief, Dkt. 10, at 13-15). The court is not persuaded by Mr. Studders' arguments. Both of Mr. Studders' arguments are speculative as nothing in the record indicates that Dr. Morris had access to Mr. Studders' hospital records, that he reviewed or relied on such records, or that no additional testing was necessary. In fact, Mr. Studders' counsel admitted at the hearing that no "nerve conduction studies" to confirm Dr. Morris's neuropathy diagnosis had been ordered or completed. (R. at 43).

Judge Jensen's second reason for discounting Dr. Morris's opinions was that, according to his own treatment records, Mr. Studders had failed to comply with treatment, a reason that the Tenth Circuit has recognized as reasonable in discounting a treating physician's opinion. (R. at 26); *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (claimant's limited use of medications was inconsistent with a treating physician's opinion that the claimant was totally disabled). Specifically, Judge Jensen noted that, in October 2009, Dr. Morris had observed that Mr. Studders was still not taking his medications or staying on his diet. (R. at 462).

Mr. Studders makes a number of arguments as to why this reason is unsupportable, none of which are persuasive. As pointed out by the Commissioner, Dr. Morris actually noted that in addition to Mr. Studders' failure to take his medication. (R. at 462), Mr. Studders was repeatedly non-compliant by continuing to use tobacco against Dr. Morris's orders. (R. at 462,

9

516, 527, 529).  Second, Mr. Studders' argument that Dr. Morris "factored the claimant's level of compliance into his opinions" is speculative as nothing in either of Dr. Morris's opinions refers to or suggests he considered Mr. Studders' non-compliance in his decision.  (R. at 501-09, 534-38).  Third, Mr. Studders' reliance on *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993) is misplaced.  The *Thompson* court relies on an earlier case, *Frey v. Bowen*, 816 F.2d 508 (10th Cir. 1987), which dealt with a particular scenario where an ALJ denies a claimant benefits under 20 C.F.R. § 404.1530.  *Frey*, 816 F.2d at 517.  This regulation and the *Thompson* analysis apply only when an ALJ first finds an individual disabled, but then must consider whether he should be provided or denied benefits due to non-compliance.  That is not the scenario here because Judge Jensen did not find Mr. Studders disabled.  The *Thompson* analysis is not triggered.

Judge Jensen's third and fourth reasons to discount Dr. Morris's opinions were that they were inconsistent with the objective medical evidence and they were internally inconsistent.  (R. at 26-27).  Judge Jensen noted while Dr. Morris opined that Mr. Studders' condition was more severe in his second July 2010 opinion than his first August 2009 opinion, the objective medical evidence revealed that Mr. Studders' condition had improved and stabilized over time.  (R. at 26).  In particular, Judge Jensen noted that Mr. Studders "had more emergency room visits in 2009, when Dr. Morris proffered his first opinion," and that Dr. Morris's treatment notes at the time of his second opinion indicated that Mr. Studders' "diabetes is stable."  (R. at 26).  The court agrees with Judge Jensen that such inconsistencies support discounting Dr. Morris's opinion.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2002)

(treating physician's lack of explanation for differences between two reports, with no apparent change in claimant's medical condition, was a reason to reject opinion).

Mr. Studders argues that this logic was in error because Dr. Morris had no choice in creating an inconsistency in the amount of hours he reported Mr. Studders could work because the different forms he filled out varied in the options they provided for opining on hours that an individual could work, with the August 2009 form having a "check-box" for three hours a day and the July 2010 form having "check-boxes" for either two hours or four hours, but not three hours, like the first form. Mr. Studders' argument that any "inconsistency was due to differing forms, not a changed medical opinion" is unpersuasive. To argue that a treating physician's opinion should not be discounted as inconsistent because the check-box forms he filled out did not permit him to accurately opine as to the hours his patient was capable of working only underscores the conclusory nature of his opinions. *Frey*, 816 F.2d at 513 (a treating physician's report may be rejected if it is brief, conclusory, and unsupported by medical evidence); *id*. at 515 (check-the-box style evaluation forms, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence). On either form, had Dr. Morris wanted to, he could have written in his opinion of how many hours Mr. Studders could work to the extent the check-box forms did not provide for accurate and consistent opinions.

Next, Judge Jensen noted that Dr. Morris's specific opinions of Mr. Studders' limitations were unsupported by and in conflict with objective medical evidence. (R. at 27). Specifically, Judge Jensen noted that while Dr. Morris claimed acidosis occurred at least on average once every two months, "the medical record does not support the frequency of the claimant's acidosis." (R. at 27). Rather, the record, which spans from 2004 through 2010, shows a concrete diagnosis of acute diabetic ketoacidosis only twice, in April 2009 (R. at 389) and in May 2009

11

(R. at 413), and a possible diagnosis of mild ketoacidosis in June 2009. (R. at 429). Similarly, Judge Jensen noted that while Dr. Morris opined that Mr. Studders had neuropathy that persistently and significantly disturbed his motor function and prevented him from ambulating effectively, the record suggested otherwise. (R. at 27; *see also* R. at 370-71 (physician observed Mr. Studders "moves all extremities well"); 410 (hospital staff observed Mr. Studders "ambulating outside of the hospital smoking with a steady nonantalgic gait"); 299-300 (Mr. Studders reporting no gait disturbances); 428-29 (Dr. Rasmussen noting that Mr. Studders "moves with all extremities well with full range of motion")). While Mr. Studders argues that "emergency room records, glucose testing, esophagus reports, and many other records" support Dr. Morris's opinion, none of these records support Dr. Morris's opinion as to the frequency of diabetic ketoacidosis or the impact of Mr. Studders' alleged neuropathy on his motor functioning and gait. It was reasonable for Judge Jensen to discount Dr. Morris's opinion for being unsupported by objective medical evidence. 20 C.F.R. § 404.1527(c)(3); *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (ALJ reasonably discounted treating physician opinion which was inconsistent with other medical evidence). Finally, Judge Jensen also discounted Dr. Morris's opinion as being inconsistent with other opinions in the record. (R. at 27). *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (an ALJ may consider other medical opinion evidence in rejecting the opinion of a treating physician).

Given all of the reasons that Judge Jensen provided for his decision to discredit the functional assessments of Dr. Morris, the court finds that Judge Jensen's decision was supported by substantial evidence in the record.

### B. Mr. Studders' Testimony

Mr. Studders also contends that Judge Jensen did not adequately take into account his subjective testimony. The ALJ must evaluate whether the claimant's descriptions of pain or other symptoms are credible. *See* 20 C.F.R. § 404.1529(c). This is a two-step process. The claimant must first demonstrate a medically determinable impairment that could "reasonably be expected" to produce the alleged symptoms. SSR 96-7p, 1996 WL 374186, at *2. Once the claimant demonstrates such an impairment, the ALJ may consider the credibility of the claimant's descriptions of symptoms and limitations in light of the entire case record. *Id.* The ALJ may consider factors such as the claimant's daily activities, treatment history, and the objective medical evidence. *Id.* at *3. Credibility determinations are the province of the ALJ and should not be disturbed if supported by substantial evidence. *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002).

Here, Judge Jensen gave several reasons why he did not find Mr. Studders fully credible. First, he noted contradictions between Mr. Studders' testimony and evidence in the record, providing as an example that while Mr. Studders testified at the hearing that he had not consumed alcohol in six years (R. at 24-25, 82-83), he reported otherwise to medical providers from 2006 forward. (R. at 319, 332, 354, 370-72). On appeal, Mr. Studders contends such inconsistencies are irrelevant as his use of alcohol does not have bearing on his medical impairments. However, this court is not persuaded because an ALJ may reasonably consider inconsistencies between a claimant's statements and the record as a whole, as such discrepancies erode away the credibility or propensity for truthfulness of the claimant. 20 C.F.R. § 404.1529(c)(4) (an ALJ must consider whether there are conflicts between a claimant's statements and the rest of the evidence); SSR 96-7p, at *5 (one strong indication of the

credibility of an individual's statements is their consistency, both internally and with other information in the case record). In her response, the Commissioner provided other examples of Mr. Studders' inconsistent statements throughout the record (*see* Answer Brief at 20), which further support Judge Jensen's findings. While Mr. Studders contends in his reply brief that this was post hoc rationalization, the Commissioner did not offer new reasons to discount Mr. Studders' testimony, but rather offered examples of contradictions in his testimony in addition to those explicitly relied upon by Judge Jensen. Offering examples that support Judge Jensen's reason to discount Mr. Studders' testimony is not offering post hoc rationalization. *Wall v. Astrue*, 561 F.ed 1048, 1067 (10th Cir. 2009) ("ALJ is not required to discuss every piece of evidence"); *Poppa v. Astrue*, 569 F.3d 1167, 1171 n.4 (10th Cir. 2009) (Tenth Circuit offered five additional examples to support ALJ's reason to discount a claimant).

Judge Jensen's second reason to discredit Mr. Studders—that he was not compliant with his treatment—is also a permissible reason not to find a claimant fully credible. (R. at 24-25). *Wilson v. Astrue*, 602 F.3d 1136, 1146 (10th Cir. 2010) (ALJ reasonably noted the claimant did not take prescription pain medication); *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000) (ALJ reasonably found the claimant failed to follow prescribed treatment). Mr. Studders testified that he was always compliant with his treatment. (R. at 80). However, Judge Jensen gave a number of examples, referring to specific parts of the record showing how Mr. Studders was not compliant with his treatment. (R. at 24-25). Though Mr. Studders attempts to downplay his noncompliance, arguing that he "generally did as his doctors recommended," this argument falls flat in light of the record of non-compliance. (R. at 299, 390, 413, 431, 462, 416, 527, 529).

Third, Judge Jensen noted that Mr. Studders' allegations were "somewhat out of proportion with the medical record." (R. at 25). Mr. Studders argues that his statements were

not out of proportion to the medical record, contending that "even medical providers struggled to get [Mr. Studders'] glucose under control." However, the record establishes that his doctors believed that this struggle was due in large part to his noncompliance with treatment. (R. at 299, 390, 413, 431, 462, 416, 527, 529). Once Mr. Studders started to consistently follow Dr. Morris's recommendations, he had no more hospital visits and his conditions stabilized. (R. at 516, 527, 529).

Given the reasons that Judge Jensen provided for discounting Mr. Studders' testimony, the court finds that Judge Jensen's decision was supported by substantial evidence in the record.

### C. **Vocational Expert Testimony**

Finally, Mr. Studders argues that Judge Jensen erred by asking the vocational expert an incomplete hypothetical which did not include all of Mr. Studders' limitations. He contends that Judge Jensen should have included limitations to permit him to check his blood sugar, work no more than fifteen hours a week, sit or stand no more than one to two hours at a time, elevate his feet every few hours, lie down frequently during the day, and other limitations to address the length of recovery after periods of low blood sugar and his general fatigue. (Pl. Br. 20-23). Though Mr. Studders frames this argument as an attack on the hypothetical questions asked of the vocational expert (i.e., a step 5 issue), the argument really pertains to the residual functional capacity assessment (made between steps 3 and 4).

Regarding the limitation to check blood sugar, the vocational expert testified that all of the positions she offered—mail clerk, parking attendant, and storage rental clerk—would be "good jobs for such a need," and that the mail clerk and storage rental clerk positions would even permit a worker to leave the worksite to tests blood sugars in private. (R. at 90-91). Thus, Mr.

15

Studders has shown no harm from the fact that this limitation was not in the ultimate residual functional capacity assessment.

In any event, however, all of the limitations Mr. Studders claims are missing from his residual functional capacity are limitations assessed by Dr. Morris, whose opinions the court finds Judge Jensen reasonably rejected. Therefore, Judge Jensen had no obligation to include them. *See Qualls*, 206 F.3d at 1372 (ALJ not required to include in his residual functional capacity assessment limitations which were not supported by the medical record). Because the vocational expert testified in response to a hypothetical (that included Mr. Studders' credible limitations) that such an individual could perform other work existing in significant numbers, Judge Jensen reasonably found Mr. Studders not disabled.

Therefore, considering the decision as a whole, the court finds that the residual functional capacity assessed by Judge Jensen was supported by substantial evidence in the record.

## **CONCLUSION**

For the reasons stated above, the court finds Judge Jensen's decision is supported by substantial evidence. His ruling is therefore AFFIRMED. The Clerk of Court is directed to close the case.

Dated this 21st day of August, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge